```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :   11 CIV. 1104 (DLC)
LARRY MARSHAK,                           :
                    Plaintiff,           :   OPINION & ORDER
                                         :
          -v-                            :
                                         :
KATHERINE SCHAFFNER, et al.,             :
                    Defendants.          :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the plaintiff:

Samantha Morrissey
William Dunnegan
Dunnegan & Scileppi LLC
350 Fifth Avenue
New York, NY 10118

For the defendants:

Kerren B. Zinner
Andrew B. Messite
Pamela L. Schoenberg
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022

DENISE COTE, District Judge:

  On January 17, 2012, plaintiff Larry Marshak ("Marshak") and defendants Katherine Schaffner ("Schaffner") and the Estate of Gladys Horton ("Horton") cross-moved for summary judgment. This Opinion addresses the parties' cross-motions for summary judgment on Marshak's false designation of origin claim. For

the following reasons, the defendants' motion for summary judgment on Marshak's false designation of origin claim is granted, while Marshak's motion for summary judgment on his false designation of origin claim is denied.

Background

The following facts are undisputed, unless otherwise noted. In 1961, Motown Records Corporation ("Motown") had one of its first major hits with the song "Please Mr. Postman," recorded by a new singing group called The Marvelettes.[1] The group began life as the "Can't Sing Yets", five high school girls from Inkster, Michigan, including Schaffner, Horton, Georgia Dobbins ("Dobbins"), Juanita Cowart ("Cowart"), and Georgeanna Tillman ("Tillman").  According to Schaffner, after the Can't Sing Yets performed at an Inkster High School talent show in early 1961, a teacher arranged a Motown audition for the group in Detroit. The group impressed Motown executives at the audition, who instructed the girls to return with an original song to perform. In response, Dobbins wrote "Please Mr. Postman".  After hearing the group perform the song, Motown offered to sign the group to a recording contract.

---

[1] Unless otherwise indicated, this Opinion will use the term "The Marvelettes" to refer to the original singing group that recorded and performed between 1961 and 1969, and whose members included Schaffner and Horton.

First, however, the group needed a new name.  According to Schaffner, Dobbins suggested "The Marvels", which Motown executive Berry Gordy changed to "The Marvelettes".  Each member of the group was then required to sign, along with a guardian, a Motown recording contract.  Because Dobbins' father refused to sign the contract, Dobbins was replaced in the group by Wanda Young ("Young").

On July 1, 1961, Schaffner and Horton both signed recording contracts with Motown ("the Contracts").  The Contracts provide for royalty payments to the Marvelettes' members based on percentage revenues of records sold.  With respect to the group's name, the Contracts state:

> The collective name of the group is THE MARVELETTES.  We shall have all of the same rights in the collective name that we have to use your name pursuant to paragraph 6 and you shall not use the group name except subject to the restrictions set forth in that paragraph.  In the event that you withdraw from the group, or, for any reason cease to participate in its live or recorded performances, you shall have no further right to use the group name for any purpose.

Paragraph six of the Contracts provides, in relevant part, that Motown "shall have the right . . . to sell and deal [records and other reproductions of performances] under any trademarks or trade-names or labels designated by us[.]"  The Contracts provide for four-year terms, and Horton and Schaffner signed

follow-up agreements containing substantially similar language bearing on trademark rights in early 1965.

The Marvelettes continued to record for Motown and perform in live concerts through the 1960s.  While the group consistently had between two and five performers during this period, its composition changed.  Three original members left the group:  Cowart in 1962, Tillman in 1965, and Horton in 1967.  Ann Bogan replaced Horton in The Marvelettes in 1967.  The group, its final iteration comprising Schaffner, Young, and Bogan, disbanded in 1969.[2]

Music recorded by The Marvelettes continues to be sold commercially and receive radio play.  Original members of The Marvelettes, including Schaffner and, until her death in 2011, Horton, receive royalty payments for radio play and song and album sales of The Marvelettes' recordings.  Horton's estate now receives royalty payments.  The payments are made by Motown's successor-in-interest, UMG Recordings, Inc. ("UMG").

During the late 1960s, Marshak, an editor at Rock Magazine, booked The Marvelettes for performances.  At his deposition, Marshak testified that booking groups involved the following process:  "You call up the group, and you say you want to work

---

[2] According to both Schaffner and Vaughn Thornton ("Thornton"), Horton's son, Horton left the group in 1967 to care for her new child.  Schaffner states that after the group disbanded in 1969, she had no plans to continue recording or performing.

4

or do XYZ performance, XYZ date, enter into a contract, and they perform it."

According to Marshak, he originally began using the mark "The Marvellettes"[3] for groups staging live performances under his production and management in the 1970s. Marshak's groups do not include any of the members of The Marvelettes who recorded music for Motown. As Marshak described it at his deposition, sometime in the early 1970s Ewart Abner, Motown's president, told Marshak that The Marvelettes were no longer recording or performing.

Marshak has had as many as three groups performing under the name "The Marvellettes" at a given time. At present, Marshak has one "Marvellettes" group performing in Las Vegas. Marshak's Marvellettes perform Motown songs, including songs originally recorded by The Marvelettes. Marshak's groups have always consisted of three female members, the ages of whom tend to correspond with the contemporary ages of the original members of The Marvelettes. The groups are advertised to the public as "The Marvellettes", and at no time during a show are audience

---

[3] Marshak uses a version of the mark that includes an extra "l". In their papers, the defendants refer to the mark as "The Marvelettes", while Marshak refers to the mark as "The Marvellettes". Neither party attempts to argue that the difference in spelling should affect analysis of the parties' claims. For simplicity's sake, this Opinion will use the original one-"l" spelling.

members told that the performers were not members of The Marvelettes group that recorded for Motown in the 1960s.

On December 27, 1976, Marshak applied for registration of the service mark "The Marvellettes" with the United States Patent and Trademark Office ("PTO") for use in connection with musical entertainment services rendered by a vocal and instrumental group. The application was unopposed; on January 3, 1978, the mark was registered by the PTO, with Marshak listed as owner.

Over the ensuing years, Horton made a number of attempts to return to the stage, and sought to use the mark in promoting her performances. According to Marshak, he threatened litigation when Horton sought to use the mark "The Marvelettes" in connection with a New Years' Eve performance she booked in 1994. On December 14, 1994, Marshak and Horton entered an agreement to settle Marshak's claims. Under the terms of the agreement, Horton agreed

> to the entry of an order of permanent injunction . . . enjoining her . . . from representing . . . that she has the right to use the name or mark, 'THE MARVELLETTES', to identify any musical performing group other than the musical performing group controlled by Larry Marshak . . . .

The agreement further provided that Marshak would "refrain from representing . . . that [Horton] does not have the right to use

6

the name or marks 'GLADYS HORTON FORMERLY OF THE MARVELLETTES' to identify [Horton] and her musical performing group."

Marshak's PTO registration for the mark "THE MARVELLETTES" lapsed in 2008.  On August 19, 2008, Schaffner and Horton filed a joint application with the PTO to register the mark "THE MARVELETTES" for use in connection with "[e]ntertainment services in the nature of a musical and vocal recording and performing group".

PROCEDURAL HISTORY

On February 17, 2011, Marshak filed his complaint in this action, alleging, inter alia, false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a).  Marshak sought injunctive and declaratory relief as well as damages.[4]  On May 9, the defendants filed their answer, including counterclaims alleging false designation of origin, trademark dilution and tarnishment, common law trademark infringement, and deceptive acts and practices in violation of New York General Business Law § 349.  Marshak filed a reply to the defendants' counterclaims on May 27.

---

[4] In their moving papers, the defendants state that Marshak "has abandoned his claims for trademark infringement and unfair competition and any other claim for damages."  Marshak does not dispute this assertion.

7

The parties cross-moved for summary judgment on January 17, 2012. The cross motions affect all remaining claims in the action. The motions became fully submitted on February 14. As noted, this Opinion addresses the cross-motions for summary judgment on Marshak's false designation of origin claim only.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

The parties have cross-moved for summary judgment on Marshak's false designation of origin claim.  The crux of the parties' dispute is whether Marshak acquired common law trademark rights in the mark "The Marvelettes".

Section 43(a) of the Lanham Act imposes civil liability on

>[a]ny person who, on or in connection with any goods
>or services . . . uses in commerce any word, term,
>name, symbol, or device, or any combination thereof,
>or any false designation of origin, false or
>misleading description of fact, or false or misleading
>representation of fact, which-
>
>(A) is likely to cause confusion, or to cause mistake,
>or to deceive as to the affiliation, connection, or
>association of such person with another person, or as

9

>  to the origin, sponsorship, or approval of his or her
>  goods, services, or commercial activities by another
>  person[.]

15 U.S.C. § 1125(a)(1)(A).  To succeed on a Section 43(a) claim, a plaintiff must establish both (1) that its trademark is entitled to protection and (2) that the defendant's mark is likely to confuse consumers as to the origin or sponsorship of its product.  <u>Virgin Enters., Ltd. v. Nawab</u>, 335 F.3d 141, 146 (2d Cir. 2003).

As both parties effectively agree, the success of Marshak's claim depends upon his showing that he owns trademark rights in the mark "The Marvelettes".  Marshak stakes his claim of ownership on common law trademark rights in the mark that he maintains he has acquired through continuous use since the 1970s.[5]  But, Marshak could not have acquired common law rights in the mark "The Marvelettes".  It is undisputed that a senior user owned the rights in the mark; that senior user did not abandon those rights and accordingly still owns them.  Marshak's false designation of origin claim therefore fails.

---

[5] In his deposition, Marshak discussed a purported assignment of rights in the mark that he claims he received from Motown sometime in the early 1970s.  Marshak has been unable to produce a copy of the assignment or testimony of any other witness with first-hand knowledge of the assignment.  Marshak does not rely upon the purported assignment either in his own summary judgment moving papers or in opposing the defendants' summary judgment motion.

Because a trademark "represents the reputation developed by its owner for the nature and quality of goods or services sold by him, he is entitled to prevent others from using the mark to describe their own goods." Defiance Button Machine Co. v. C & C Metal Products Corp., 759 F.2d 1053, 1059 (2d Cir. 1985). The Lanham Act's protection extends to unregistered, common law trademarks. Time, Inc. v. Peterson Publishing Co., L.L.C., 173 F.3d 113, 117 (2d Cir. 1999). Common law "[t]rademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization." Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir. 1998) (citation omitted).

It is a matter of first principles that "for inherently distinctive marks, ownership is governed by priority of use. For such marks, the first to use a designation as a mark in the sale of goods or services is the 'owner' and the 'senior user.'" McCarthy on Trademarks and Unfair Competition § 16:4 (4th ed. 2012).[6] "The user who first appropriates the mark obtains [an] enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1271 (2d Cir. 1974). Accordingly, a junior user

---

[6] It is undisputed that "The Marvelettes" is a distinctive mark.

11

cannot develop common law rights in a mark where a senior user already owns those rights and has not abandoned them.  See ITC v. Punchgini, Inc., 482 F.3d 135, 147 (2d Cir. 2007).

If "an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'"  Id.  An abandoned mark "returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace, in accordance with the basic rules of trademark priority."  Id. (citation omitted).  A party asserting abandonment must demonstrate "(1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future."  Id. (citing 15 U.S.C. § 1127).

Rights in a mark signifying a singing group are not abandoned by the owner upon the group's disbandment, so long as the owner continues to receive royalties from the sale of the group's previously recorded material.  "[A] successful music group does not abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's secondary meaning in the music industry."  Marshak v. Treadwell, 240 F.3d 184, 199 (3d Cir. 2001) (citation omitted).  Accord The Kingsmen v. K-Tel Int'l, Ltd., 557 F.Supp. 178, 183 (S.D.N.Y. 1983) (members of The Kingsmen continued to receive royalties).  "The

continuous use of the mark in connection with the commercial exploitation of [a] group's recordings in this country g[ives] rise to a strong inference of an intent not to abandon the mark."  Treadwell, 240 F.3d at 199.

The defendants are entitled to judgment as a matter of law on Marshak's false designation of origin claim.  Simply put, Marshak cannot establish ownership rights in the mark because a senior user owned those rights prior to Marshak's first use of the mark to promote live musical performances, and that senior user has not abandoned the mark.[7]

It is undisputed that a senior user established trademark rights in "The Marvelettes" prior to Marshak's first commercial use of the mark in the early 1970s.[8]  Under traditional priority of use principles, the owner of "The Marvelettes" retains the right to exclude others from using the mark, preventing others from developing common law rights in the mark, unless the owner abandoned the mark.  The mark "The Marvelettes" has not been abandoned.  To the contrary, it remains in use by its legal owner.  UMG, Motown's successor, continues to sell recordings by

---

[7] It is not necessary for purposes of deciding the cross-motions for summary judgment on Marshak's false designation claim to determine whether the members of The Marvelettes or Motown own rights in the mark.

[8] Indeed, in his summary judgment moving papers Marshak asserts that Motown owned the mark during the 1960s.

The Marvelettes under the mark, and continues to license the group's music for radio play. Shaffner and Horton's estate continue to receive royalties for both sales of recordings and radio plays. The continued exploitation of the mark's secondary meaning through record sales and radio play demonstrates both use of and an intent not to abandon the mark.

Because Marshak bases his purported ownership of the mark on common law rights, he must demonstrate the senior user's abandonment of the mark.[9] This he cannot do.

First, Marshak argues that while Motown owns the rights to use the mark in connection with the sale of recorded performances, Motown abandoned its use of the mark in connection with live musical performances. In essence, Marshak argues that a single mark may be used to designate recorded performances of one origin and live performances of an entirely different origin.

Marshak is wrong, as a matter of trademark first principles. As the Court of Appeals explained in another case involving Marshak's efforts to claim trademarks associated with vintage recording groups, "[a] trade name or mark is merely a

---

[9] In his briefing of the cross-motions, Marshak disclaims any reliance upon the purported assignment of rights from Motown or upon his lapsed PTO registration of the mark "The Marvellettes". He relies instead exclusively upon his alleged common law rights in the mark.

symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes." Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984). For that reason, "[u]se of the mark . . . in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." Id. In Green, the court held that the transfer of the trademark "Vito and the Salutations" to Marshak would be a transfer devoid of the trademark's associated goodwill:

> Entertainment services are unique to the performers. Moreover, there is neither continuity of management nor quality and style of music. If another group advertised themselves as VITO AND THE SALUTATIONS, the public could be confused into thinking that they were about to watch the group identified by the registered trade name.

Id. at 930.

Basic principles of consumer protection embedded in the trademark laws explain why Marshak cannot own the rights to "The Marvelettes" for use in live performances while Motown (and/or members of The Marvelettes) continues to own the rights in connection with marketing recordings. Both uses of the mark draw upon the same source of consumer goodwill: The Marvelettes' original recordings and performances during the 1960s. Moreover, Marshak quite clearly trades upon the consumer

15

goodwill associated with the original group's use of the mark. His "Marvellettes" perform songs recorded by the original Marvelettes, and throughout the years Marshak has presented performers of approximately the same age as the contemporary age of the original Marvelettes.  Marshak makes no effort to alert potential audience members that his performers are not members of the original group.  To the contrary, Marshak's presentation of live performances under the mark encourages potential audience members to believe that they are paying to see the original group whose recordings continue to be sold and receive radio play, rather than a tribute band.  The danger of consumer confusion and deception is manifest, and indeed, has almost certainly been realized in this case.  Marshak's argument that he owns the mark for live performances while Motown owns it for musical recordings must fail.

Marshak cites to Bell v. Streetwise Records, Ltd., 761 F.2d 67 (1st Cir. 1985), to argue that trademark rights in musical recordings and live performances are distinguishable.  Bell concerned a dispute over common law trademark rights in the name of a musical group.  Id. at 69-71.  The First Circuit held that while the original members of the group might have trademark rights in the mark in connection with live performances, they had no such rights in connection with the national recording

market, having acknowledged in their contracts with the recording studio that it was the sole owner of such rights. Id. at 72, 75.  Importantly, therefore, Bell concerned a dispute over trademark rights between group members and the music studio under whose management the group attained national prominence. See id. at 70.  Moreover, the court expressly noted that it need not "resolve th[e] difficult matter" of determining the rights of the group members if the studio sought to use the trademark to market recordings where the original group members had been replaced. Id. at 74.  This case presents the very different issue of whether a party, who is essentially a stranger to the creation of goodwill associated with a mark, may develop common law rights in the mark for live performances where the original owner maintains rights in the mark to market musical recordings.

Finally, it is necessary to address briefly Marshak's claim that Horton abandoned any rights in the mark by agreeing in 1994 to the entry of a permanent injunction against her use of the mark.  Horton's 1994 settlement agreement with Marshak does not support Marshak's claim of ownership.  Even if Horton abandoned any rights in the mark she possessed by entering the agreement with Marshak, the mark did not enter the public domain. Assuming that the group's members, as opposed to Motown, retained rights in the mark after the group disbanded, it does

17

not follow that one group member could unilaterally abandon the group's rights in the mark at the expense of the other group members. Indeed, in the case of singing groups or ensembles, trademark rights are generally found to rest in the group as a collective, see, e.g., Kingsmen, 557 F.Supp. at 182, and are not found to follow an individual member who has left the group and seeks to use the rights to the exclusion of fellow group members. See Robi v. Reed, 173 F.3d 736, 740 (9th Cir. 1999). In fact, Marshak himself adopts the point that trademark rights rest in the group rather than its individual members, and presses it quite vigorously in his opposition papers.

CONCLUSION

The defendants' January 17 motion for summary judgment on Marshak's false designation of origin claim is granted. Marshak's January 17 motion for summary judgment on his false designation of origin claim is denied.

SO ORDERED:

Dated:   New York, New York
         May 11, 2012

                                    _____
                                         DENISE COTE
                                    United States District Judge